---

(17 Misc. Rep. 445.)

### In re VAN HOUTEN'S WILL.

(Surrogate's Court, Rockland County. June, 1896.)

WILLS—UNDUE INFLUENCE.

Undue influence in procuring the execution of a codicil three weeks after the will was made, reducing the amount of a mortgage which the will required the devisee (testator's grandson) to give to his uncle (testator's son), is shown by evidence that testator was 82 years old; that his relations with his son had not changed since the will was made; that testator, after signing the will, said he felt happy and was more contented, but a few days afterwards he was dejected and refused to take medicine, said he wanted to die, and complained to the nurse of his grandson's treatment of him, and told her that his grandson, who was not pleased with the will, threatened to go away and hang himself, as his father had done, if the testator did not change things; that the grandson, who had constant communication with testator, and managed his property for him, changed his manner towards the testator as soon as he was informed of the contents of the will, handled him roughly, spoke harshly to him, and finally arranged for the scrivener to come and write the codicil.

Proceeding for the probate of the will of George Van Houten, deceased. Granted.

For former decision, see 37 N. Y. Supp. 39.

Frank Comesky, for executors.
A. V. Fellows and Alonzo Wheeler, for Ralph Van Houten.
G. Z. Snider, for contestant.

TOMPKINS, S. The deceased died on the 15th day of August, 1895, at the age of 82 years. The proponents have offered for probate instruments purporting to be the last will and testament and codicil, executed respectively on the 7th day of May, 1895, and the 29th day of May, 1895. The probate of the alleged codicil is contested by Edward C. Van Houten, a son of the deceased, he alleging that the testator had not mental capacity to make and execute the

codicil, and that he was unduly influenced to make it, and that the paper was not executed in conformity with the statute. At the close of the proponent's case, a motion was made by contestant's counsel to dismiss the proceeding for the probate of the codicil on the ground that the same had not been executed with the formalities required by law. That question was then fully presented, and a decision was made denying the motion, and, while the same objection is still urged by contestant, there has been no testimony introduced on his part of a character to change the opinion which was then expressed. The question of the mental capacity of the testator is not now urged by contestant, except so far as it may have rendered the deceased susceptible to such influence. While the testator was a very old man, feeble in body, and for a year before his death was confined to his home, and required the constant attendance of a nurse, it is, nevertheless, conceded by all of the witnesses who testified on the subject that he was of sound mind down to the time of his death, and that about the time the will and codicil were executed, and subsequent thereto, he comprehended and understood all matters that were talked about in his presence. He alone gave instructions to the draftsman of the will and codicil concerning the disposition of his property in a comprehensive and intelligent manner, and, without discussing this question further, I find that at the time of the execution of both the will and codicil he was of sound mind and capable of devising and bequeathing his estate.

The contestant insists that the testator was unduly influenced by persuasion, threats, fears, and duress to make the codicil. The will contained the following provision:

"Third. The other half of the Barker farm and the homestead on which I reside, that was given to my daughter Fanny in a former will, I give and devise to my grandson Ralph Van Houten, subject to a mortgage of five thousand dollars, which he shall give to my son Edward C. Van Houten."

By the codicil the amount of the mortgage which the will provided that Ralph Van Houten should give to Edward C. Van Houten was reduced from the sum of $5,000 to $1,000, without interest, so long as the said homestead should remain in the possession of Ralph. The codicil also provided that the personal property at the barn should go to Ralph Van Houten; also the kitchen furniture. By the will the kitchen furniture was to be divided, and Edward C. Van Houten was to have all of the personal property excepting the farm utensils, which were bequeathed to Ralph. The contention of the contestant is that, after the execution of the will, on the 7th day of May, 1895, and until the 29th day of May, 1895, when the alleged codicil was executed, Ralph Van Houten, the sole beneficiary under the codicil, by his manner and conduct towards his grandfather, and his treatment of him, and threats, so worked and operated upon the old man's mind that he was unduly influenced to make the codicil. In considering this question, a clear understanding of the relations of the parties and of the several members of his family will aid us. The deceased resided at Orangeville, in Rockland county, and, after his son William's death, which occurred nearly 30 years ago, his household

consisted of himself, his wife, his deceased son William's wife and three children, his daughter Fanny, and the contestant, Edward C. Van Houten. Ralph Van Houten is a son of the testator's deceased son William, and some time prior to 1890 left the testator's home, and went away. After that the other children of William left the testator's home, and the son William's widow died. In 1890 the testator's wife died. Then Ralph returned to his grandfather's farm, and remained there until the old man's death, during all of which time he worked upon the farm, and under an agreement with his grandfather had some share or interest in the products and profits of the farm, and during the sickness and physical decline of the deceased had full authority and control of the farm and premises. The testator's daughter Fanny died on the 5th day of July, 1894, and after that the testator and Ralph Van Houten were the only members of the family left together at the homestead. As the testator grew more feeble, and gave less of his attention to the management of the farm, Ralph assumed the general charge and management of the affairs of the farm, superintending and directing the workmen and assisting in the care of his grandfather. A will was prepared for the deceased and executed by him in 1888, by which he devised to his daughter Mary the Barker farm, subject to a mortgage of $1,000, to be given to each of the three children of his deceased son, William, and devising all the rest, residue, and remainder to his wife, Margaret, and daughter Fanny, and providing further as follows:

"By reason of advancements and conveyances of a portion of my real estate by deed of conveyance and gift to my son Edward C. Van Houten, I have omitted him from any further participation of my estate in and by this testamentary disposition of the same."

Another will was made in April, 1891, by which he gave to his daughter Mary the Cooper farm, and by which he gave to his daughter Fanny and to the children of William the Barker farm. All of the residue he gave to his daughter Fanny. This will contains the same reference to his son Edward C. Van Houten, the contestant, and was made after his wife's death. Then, again, on the 10th day of August, 1894, and after his daughter Fanny's death, he made a codicil, by which he bequeathed unto his son Edward C. Van Houten all the "actual money of which I may die possessed, together with whatever may be due to me and unpaid from my share of the products of the farm; also all money or moneys standing to my credit or in my name in any of the savings banks or banks of deposit, except so much of the moneys above described as may be required to pay my just debts and obligations and my funeral expenses." There seems to have been no change in the family, or in the relations they bore to each other, from the date of this codicil to the date of the execution of the will and codicil now offered for probate. The codicil was drawn by one S. B. Huested, who also drew and superintended the execution of the will, and I find that in the execution of the codicil all the requirements of the law were complied with. The contestant contends that from the relations existing between the deceased and his grandson Ralph Van Houten, and from the fact that the

codicil made in favor of the latter radically changes the provisions of the prior will, undue influence should be presumed, and that the burden of proof is thereby cast upon the proponent.

It appears from the testimony of Jared Osborn, who worked upon the place, and was one of the subscribing witnesses, and a witness for the proponent, that shortly after the will was executed he stated to Ralph, in substance, the provisions of the will in respect to the $5,000 mortgage, which Ralph should give to the contestant, and which his (Ralph's) share should be charged with. Then, in about three weeks' time, this codicil was made, changing the amount of the mortgage from $5,000 to $1,000, without interest. There is no proof that during these three weeks the relations between the deceased and his son Edward changed, or that there was any apparent reason for so radical a change in the provisions of his will. Ralph was in sole possession and charge of the farm, and the deceased was dependent upon him for the care of his property. Ralph was in constant communication with his grandfather, and from the testimony of the nurse, Jennie Marah, the deceased and Ralph had arranged for the coming again of Mr. Huested to the house for the purpose of making the codicil. Ralph occupied a position of influence and authority over his grandfather and the affairs of the place. I am in doubt as to whether or not these conditions and relations in themselves shift the burden of proof from the contestant to the proponent. From all of the evidence, however, I have come to the conclusion that the codicil was not the free and voluntary act of the testator. After the death of his wife, he changed his will, and made ample provision for his sick daughter, Fanny, by which will he excluded the contestant from a participation of his estate, giving as a reason therefor that he had already bestowed property upon him. This was due apparently to his desire to make as ample provision for his invalid daughter as was possible. After her death he made the will now offered for probate, the validity of which is not now questioned. By this will he gives $5,000 of his estate to the contestant. It is not claimed that anything occurred in the relations between him and the contestant after the execution of the will which can be assigned as a reason for so radical a change as was made by the codicil. The contestant lived at Nyack, several miles distant from the deceased, while Ralph, upon whom the testator was dependent in a very large sense, lived and was constantly with him. It was testified by Orpha D. Van Houten that on the 8th day of May—the day after the will was made—the deceased was bright, and said that he felt happy and more contented, and told her that he had made a change, and said: "Tell Eddie that Mr. Huested has been here, and fixed my will, and Eddie must pay him." There is no claim that Edward C. Van Houten, the contestant, or any one in his behalf, unduly influenced the deceased to make the will. It appears from the testimony of the same witness, Orpha D. Van Houten, that the next week, when she saw him, she observed a change. He seemed cast down; he said he felt very badly; refused to take his medicine, and informed her that Ralph did not like the changes that he had made

in the will; and from that time to his death he refused to take any more medicine, and said that he was not going to live, and wanted to die. He frequently said that Ralph had threatened to commit suicide, as his father, William Van Houten, had done, and the deceased complained that he never could live through such a thing again, and that he did not want to do anything that might bring that on again. The nurse, Jennie Marah, who impressed me as being a very truthful and conscientious witness, had been with the deceased some time before the will was executed. She was in the room at the time of the execution of the will, and heard the deceased say that he wanted $5,000 to go to his son Edward; and after the will was made he said he felt happy. She testified that after the making of the will Ralph's treatment of him changed. He handled his grandfather roughly, and spoke harshly to him, and on an occasion after the making of the will, and before the codicil was executed, the witness heard Ralph talking with his grandfather about the will, and heard Ralph say (quoting the words of the witness): "As sure as there was a God in heaven, he would suffer from the way he treated him." She observed a decided change in the old man's manner and condition a few days after the will was made, which continued down to his death. Before this change came, he was anxious to live, spoke about being provided with winter clothing, took his medicine regularly, and ate well. After the change, he refused to take his medicine, said he was going to die, and complained that the nurse was trying to keep him living, and evidenced a restlessness and uneasiness and a desire to die. He complained to the nurse of Ralph's treatment of him. He said that he was tormenting him, and told her that Ralph was not pleased with the way he had fixed his property, and that he was tormenting him, and that he said that he was going away from him, and would leave the place, which he assigned as his reason for wanting to die. He also said to the witness that Ralph threatened to hang himself, as his father had done, if he did not change things. This all occurred in the month of May, between the time of the making of the will and the codicil. He frequently expressed his fear that Ralph would leave him, and would say, "What will I do if Ralph leaves?" This witness testified that his troubles and Ralph's manner towards him and treatment of him seemed to be on his mind all the time. The morning of the day the codicil was executed he was very uneasy, and sent the nurse to the barn to Ralph, to know if Mr. Huested was coming. After the execution of the codicil, he refused to take his medicine; his condition grew gradually worse; he did not want to see the contestant, or speak to the contestant's wife; whereas before he had always wanted to see them, and was cordial in his manner towards them. He requested that the contestant be not informed of the making of the codicil.

These facts and conditions, in connection with the radical change made in the provisions of the will, so shortly after its execution, and the fact that the change in the testator's condition began almost immediately after Ralph became aware of the provisions of the will in

respect to the $5,000, are only consistent with the conclusion that the codicil was the result of duress or fear, produced by Ralph's conduct, treatment, and threats. In the helpless condition in which he was, and dependent upon Ralph, he apparently feared that unless he made a change to accord with Ralph's views, he would either hang himself, as his father had done years before, or would abandon the place, and leave the old man helpless and alone. While it is apparent from the testimony that the deceased himself gave the instructions to Mr. Huested in reference to the change that he wanted made, and that the preparation and execution of the codicil were regularly and orderly done, and while I am fully satisfied that Mr. Huested and the subscribing witnesses observed nothing at the time to indicate that the deceased was laboring under any restraint or any improper influence, I am, nevertheless, forced to the conclusion that he had been so wrought upon, harassed, and tormented, that he had determined to rid himself of further annoyance, and of the danger of Ralph's leaving him, by having his (Ralph's) wishes complied with. If so, the codicil was not his will, but was the will and desire of Ralph, and, in the light of the original will and all the surrounding circumstances, was the result of the controlling influence of Ralph's conduct and threats. In coming to this conclusion, I have carefully considered the testimony of all the witnesses, and have not considered the declarations made by the deceased to the witnesses in the absence of Ralph, except so far as they tend to show the effect of Ralph's threats and treatment upon the testator. A decree will therefore be made admitting the will to probate, and refusing probate to the codicil, with costs to all parties out of the estate.

Ordered accordingly.